## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **No. 2:05-00014** |
| | ) | **Judge Trauger** |
| ED WINDDANCER | ) | |
| | ) | |

## MEMORANDUM

This matter comes before the court on a Motion to Dismiss the Indictment filed by the

defendant (Docket No. 30), to which the United States has responded (Docket No. 38). For the

reasons discussed herein, the defendant's motion will be denied.


## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The defendant, Ed Winddancer, was indicted on six counts relating to possessing and

bartering eagle feathers and feathers plucked from other migratory birds. (Docket No. 30.)

Winddancer, as befits his name, performs Native American dances at pow-wows and has

produced recordings of Native American flute music and traveled to Europe to perform his

music and dance. While dancing, Winddancer wears the feathers of eagles, hawks and other

birds. He alleges that the sacred feathers are crucial to the proper practice of his religion, which

he alleges to be a Native American religion, though he does not specify which one.

Because Winddancer is not a member of a federally recognized Native American tribe,

the Indictment charges that he has violated the Bald and Golden Eagle Protection Act

("BGEPA"), 16 U.S.C. § 668(a), and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §

703, by possessing the feathers. On July 20, 2005, Winddancer traded feathers with an

1

undercover agent for the U.S. Fish and Wildlife Service. The agent and Winddancer traded feathers on two successive days, after which two other Fish and Wildlife agents searched Winddancer's motor home, finding many contraband feathers. (Docket No. 30.) Winddancer was subsequently indicted on six charges: (1) possession, bartering, and offering to barter eagle feathers on July 20, 2005, in violation of the BGEPA; (2) possession, bartering, and offering to barter eagle feathers on July 21, 2005, in violation of the BGEPA; (3) possession, bartering, and offering to barter migratory bird feathers on July 20, 2005, in violation of the MBTA; (4) possession, bartering, and offering to barter migratory bird feathers on July 21, 2005, in violation of the MBTA; (5) selling and receiving contraband wildlife in excess of $350 on July 20, 2005, in violation of both the BGEPA and the MBTA; and (6) selling and receiving contraband wildlife in excess of $350 on July 21, 2005, in violation of both the BGEPA and MBTA. In addition, the United States seek forfeiture of Winddancer's collection of contraband feathers and parts, as well as his motor home, for its use in possessing and selling the items. (Docket No. 22).

The Secretary of the Interior has issued a set of regulations for both the BGEPA and the MBTA, creating a permit system which allows for limited possession of bird parts. 50 C.F.R. §§ 22.11(a), 22.22. The BGEPA applies only to bald and golden eagles. Under the regulations for the BGEPA, only members of Indian tribes recognized by the United States Bureau of Indian Affairs may apply for a permit to possess bald and golden eagle feathers for religious use. 50 C.F.R. § 22.22. The permits are good for life and grant the recipient access to the National Eagle Repository. *Id.* In general, Native Americans are not permitted to acquire eagle parts from any source other than the National Repository. However, certain tribes are allowed to take birds from private rookeries for use in religious ceremonies.

2

Unlike the BGEPA, the MBTA covers all migratory birds.  Under the MBTA's regulations, several avenues are open for legal possession of migratory bird parts that are not available for possession of bald and golden eagle parts.  Under the "Morton Policy," promulgated by Secretary of Interior Rogers C.B. Morton, all American Indians—that is, members of federally recognized Indian tribes—"may possess, carry, use, wear, give, loan, or exchange among other Indians, without compensation" migratory birds and bird parts covered by the MBTA without a permit.  (Docket No. 30, Ex. 11.)  In addition, the regulations implementing the MBTA provide for permits to possess migratory bird parts for a variety of purposes.  For instance, 50 C.F.R. § 21.27 provides for special purpose permits available to all citizens "for special purpose activities related to migratory birds, their parts, nests, or eggs" that are not otherwise provided for by the other permit provisions.  However, Winddancer did not apply for a permit, under that section or any other permit provision.

On April 27, 2006, the defendant filed a Motion to Dismiss the Indictment, alleging that both the BGEPA and the MBTA, as implemented by the Department of Interior, violate his rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb.  (Docket No. 30.)  Specifically, the defendant alleges that both statutes as implemented substantially burden his sincere religious practices involving the feathers and parts of protected birds and that the burden does not further a compelling government interest by the least restrictive means.

**ANALYSIS**

3

## I.    Standard of Review

Motions to dismiss indictments are governed by Rule 12 of the Federal Rules of Criminal Procedure, which states "Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." Fed. R. Crim. P. 12(b).   The Sixth Circuit guides district courts to "dispose of all motions before trial if they are capable of determination without trial of the general issue." *U.S. v. Jones*, 542 F.2d 661, 665 (6th Cir. 1976).  Moreover, "Rule 12 vests the Court with authority 'to determine issues of fact in such manner as the court deems appropriate.'" *Id.* (quoting Notes of the Advisory Committee to Fed. R. Crim. P. 12, reprinted in 8 Moore P 12.01(3) at 12-8).  The Federal Rules of Criminal Procedure "clearly envision that a district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Jones*, 542 F.2d at 664; *see also U.S. v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997) ("District Courts may ordinarily make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate factfinder.").  A defense raised in a motion to dismiss indictment is "capable of determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Jones*, 542 F.2d at 664 (citing *United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 1561, 23 L.Ed.2d 94 (1969)).

An indictment that is valid on its face may not be dismissed on the ground it is based on inadequate or insufficient evidence. *United States v. Williams,* 504 U.S. 36, 54 (1992). Therefore, a court cannot consider a factual challenge to an indictment purporting to show a

defect consisting solely of insufficient evidence to prove a particular charge. *Id.* Rule 12(b)(1) of the Federal Rules of Criminal Procedure, which cautions the trial judge that he may consider on a motion to dismiss the indictment only those objections that are "capable of determination without the trial of the general issue," indicates that evidentiary questions of this type should not be determined on such a motion. *United States v. Knox,* 396 U.S. 77, 83 n.7 (1969). In short, "a motion to dismiss should be denied if it requires a pretrial test of the government's evidence." *U.S. v. Jones*, No. 1:05-132, 2006 WL 399234, at *1 (E.D. Tenn. Feb. 16, 2006).

On a motion to dismiss indictment, "the [c]ourt must view the [i]ndictment's factual allegations as true, and must determine only whether the [i]ndictment is 'valid on its face.'" *U.S. v. Campbell*, No. 02-80863, 2006 WL 897436, at *2 (E.D. Mich. April 6, 2006) (citing *Costello v. United States,* 350 U.S. 359, 363 (1956)). Accordingly, the court must resolve factual issues in this case, such as they exist, in favor of the indictment. With this standard in mind, the court turns to an analysis of the defendant's motion.

## II.     Defendant's RFRA Defenses

The defendant argues that he is exempt from prosecution for possessing and bartering contraband bird parts under the RFRA. That statute provides that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-

1(b).[1]  The defendant alleges that his activities involving the feathers hold a religious significance to him, and, though he concedes that the government has a compelling interest in preserving both the birds themselves and the cultures of recognized Indian tribes (which require access to some protected birds), he maintains that the government has not chosen the least restrictive means of furthering those interests.  The court disagrees.

It was Congress' intention, in enacting the RFRA, to restore the compelling interest test long applied by the Supreme Court when interpreting the Free Exercise Clause of the First Amendment to the Constitution—*see, e.g., Sherbert v. Verner*, 374 U.S. 398, 405 (1963); *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)—and abandoned by the Court in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872, 879 (1990).  *See In re The Grand Jury Empaneling*, 171 F.3d 826, 829 (10th Cir. 1999) (In the RFRA, Congress attempted "to restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder*.").  Under the RFRA, as in the compelling interest test, the defendant bears the initial burden to demonstrate a sincere religious belief that has been substantially burdened by the state. *U.S. v. Myers*, 95 F.3d 1475, 1483 (10th Cir. 1996) (citing *Yoder*, 406 U.S. at 215 (beliefs that are "philosophical and personal rather than religious . . . [do] not rise to the demands of the Religion Clauses").  Once the defendant has made that showing, the burden shifts to the state to demonstrate that the challenged regulation furthers a compelling state interest by the least

[1]The RFRA was declared unconstitutional as applied to the states in *City of Boerne v. Flores*, 521 U.S. 507, 530-35 (1997).  However, it remains valid as applied to the federal government.  *See Gonzales v. O Centro Espirita Beneficente Uniai Do Vegetal*, 126 S.Ct. 1211, 1216 (Feb. 21, 2006); *United States v. Sandia*, 188 F.3d 1215, 1217 (10th Cir. 1999); *Adams v. CIR*, 170 F.3d 173, 175 (3d Cir. 1999); *Alamo v. Clay*, 137 F.3d 1366, 1367 (D.C. Cir. 1998).

Case 2:05-cr-00014   Document 45   Filed 06/19/06   Page 6 of 23 PageID #: 614

restrictive means. *Adams*, 170 F.3d at 175; *Jolly v. Coughlin*, 76 F.3d 468, 478 (2d Cir. 1996).

A.    **Defendant's Standing to Challenge the MBTA**

Before performing the burden shifting analysis described above, the court must address a standing issue. The United States argues that the defendant does not have standing to challenge the regulations implementing the MBTA because, under those regulations, the defendant could have applied for a permit to possess migratory bird parts but did not do so. Indeed, courts have not typically allowed defendants to make collateral challenges to regulatory statutes where the defendant inexplicably failed to apply for a permit to perform the activity in question. *Madsen v. Boise State University*, 976 F.2d 1219, 1221 (9th Cir. 1992) ("[A] plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit."); *see also Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166-71 (1972) (plaintiff who had never applied for membership lacked standing to challenge fraternal organization's discriminatory membership policies); *Lehon v. City of Atlanta,* 242 U.S. 53, 56 (1916) (non-resident who never applied for permit lacked standing to challenge licensing ordinance on ground that city officials discriminate in favor of residents in awarding licenses); *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 56 (D.C. Cir. 1991) (plaintiffs lacked standing to challenge failure to extend Indian hiring preferences into job categories for which they never formally applied); *Oil, Chemical & Atomic Workers Int'l Union v. Gillette Co.,* 905 F.2d 1176, 1177 (8th Cir. 1990) (employee who has not filed benefits claim lacks standing to challenge employer's retirement policy); *Doe v. Blum,* 729 F.2d 186, 189-90 (2d Cir. 1984) (plaintiffs who never requested family planning services may not challenge Medicaid distribution procedures); *Brown v. Sibley,* 650 F.2d 760, 770-71 (5th Cir. Unit A Jul. 1981) (plaintiffs who had never participated

7

in or been excluded from program receiving federal funding lacked standing to challenge its compliance with Rehabilitation Act); *Jackson v. Dukakis,* 526 F.2d 64, 65-66 (1st Cir. 1975) (plaintiff who did not apply for employment with state agencies lacks standing to allege discriminatory hiring practices); *Interstate Commerce Comm'n v. Appleyard,* 513 F.2d 575, 577 (4th Cir. 1975) (trucker who has never applied for ICC transportation permit has "suffered no legally cognizable injury" from policy), *cert. denied,* 423 U.S. 840 (1975).

This standing requirement "serves the salutary objective of ensuring that only those individuals who cannot resolve their disputes without judicial intervention wind up in court," *Madsen*, 976 F.2d at 1221, for, as the United States argues, the court has no way to know whether the defendant could have been granted a "special purpose" permit under 50 C.F.R. § 21.27 without his having applied for one.  In the event that the defendant were granted such a permit and could legally possess migratory bird feathers, the MBTA could not be said to burden his religious use of the feathers.  *See, e.g., East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 227 (6th Cir. 1995) (holding that the plaintiffs lacked standing to challenge a permit provision without showing that they would have been ineligible to obtain a permit).

In similar challenges to federal bird feather regulations, courts have addressed the standing issue consistently with the above approach.  In *United States v. Huggs*, 109 F.3d 1375, 1378 (9th Cir. 1997), the court held that the defendant—a member of a federally recognized Indian tribe—did not have standing to challenge BGEPA as it applied to him personally, because he could have applied for a permit to possess the bird parts legally but did not do so.  Reasoning that "failure to apply for a permit precludes challenge to the manner in which the Act is administered," the court held that the defendant could challenge only the "facial validity of the

8

BGEPA and its regulations" and not "the operation of the underlying administrative scheme."

*Id*, *see also U.S. v. Lundquist*, 932 F. Supp. 1237, 1242 n.4 (D. Or. 1996) (holding that the defendant "has no standing to challenge the alleged imperfections of the permit process because he has never applied for a permit"); *United States v. Thirty-Eight Golden Eagles or Eagle Parts*, 649 F. Supp. 269, 277 (D. Nev. 1986) (holding that the defendant could challenge only the "facial validity of the Act" and not "the manner in which the Act is administered" where the defendant had not applied for a relevant permit").

In *United States v. Hardman*, 297 F.3d 1116, 1121 (10th Cir. 2002), the court held that the defendants did have standing to challenge the regulatory scheme at issue because applying for permits would have been futile. In *Hardman*, the defendants challenged only the BGEPA, which does not allow non-members of federally recognized tribes to apply for permits, and not the MBTA, which does allow for such permits. *Id*. at 1120-21. As in Hardman, Winddancer does have standing to challenge the regulations administering the BGEPA because—for the same reasons as in Hardman—applying for a BGEPA permit would have been futile for Winddancer. However, Winddancer does not have standing to challenge the manner in which the MBTA has been administered against him, because applying for a permit under the MBTA would not have been clearly futile. *Id.*, *see also United States v. Gonzales*, 957 F. Supp. 1225, 1227 (D. NM 1997) (permitting the defendant to mount a challenge to the permit process without having applied for a permit only where the defendant challenged the fact of the application process itself").

Having established that Winddancer can mount only a "facial" challenge to the MBTA, it

9

is necessary to define how exactly that "facial" challenge differs from an "as applied" challenge.[2]

The Supreme Court has held that a facial challenge requires a showing that "no set of circumstances exists under which the Act [in question] would be valid." *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 514 (1990) (O'Connor, J., concurring) (quoting *Webster v. Reproductive Health Services*, 492 U.S. 490, 524 (1989)); *see also U.S. v. Salerno*, 481 U.S. 739, 746 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Therefore, in order to demonstrate that the MBTA is facially invalid, the defendant would have to show that it is not capable of being applied without violating the RFRA.

The defendant has not shown, nor has he even alleged, that the MBTA is incapable of application without violating religious rights guaranteed by the RFRA. Instead, the defendant challenges a specific facet of its application—the "Morton Policy"—under which members of federally recognized Indian Tribes are not subject to the Act. The defendant does not allege that the MBTA cannot be constitutionally enforced but rather that the "Morton Policy" should be expanded, ever so slightly, to include religious practitioners such as himself. Therefore, the defendant's MBTA challenge must fail.[3]

_____

[2]The court will assume, in accordance with other federal courts to address this issue, that the RFRA—which creates statutory, and not Constitutional rights—can be called upon to mount both "facial" and "as applied" challenges to federal legislation. *Huggs*, 109 F.3d at 1378.

[3]The defendant has not invoked the "overbreadth doctrine" in order to circumvent the standing requirement for the MBTA challenge, and for good reason. Because the defendant's challenge arises under the RFRA, and not the First Amendment, the "overbreadth doctrine" may not be invoked to expand review of the MBTA. *See Coleman v. DeWitt*, 282 F.3d 908, 914 (6th Cir. 2002) ("Neither the Supreme Court nor this court has applied the overbreadth doctrine when

**B.      Defendant's Challenge to the BGEPA**

Because it would have been futile for the defendant to apply for a permit under the BGEPA, the court now turns to analyze the defendant's RFRA challenge to his prosecution under that statute. *Huggs*, 109 F.3d at 1378.

**1.      A Sincere Exercise of Religion**

The defendant bears the initial burden of demonstrating that the regulations at issue substantially burden a sincere religious belief. *Yoder*, 406 U.S. at 215 (beliefs that are "philosophical and personal rather than religious . . . [do] not rise to the demands of the Religion Clauses"). Although the defendant has shown that the BGEPA substantially burdens his ability to possess eagle feathers—under BGEPA, he may not possess them—he has not shown that his desire to possess the feathers arises from a sincere religious belief.

The defendant has identified at least some Native American ancestry on both sides of his genealogy. According to the defendant, his father had Cherokee ancestry, and his mother Nanticoke ancestry. (Docket No. 30 at p. 2-3.) In addition, he alleges to have been formally admitted as an associate member to the Nanticoke tribe (which is not federally recognized), and to have been adopted by a Lakota family. (*Id.*) He is not a member of the Lakota tribe, however, or the Cherokee tribe. (*Id.*) According to the materials attached to the defendant's brief, the Nanticoke people are indigenous to Delaware. (Docket No. 30, Ex. 2.) The Cherokee tribe and Lakota tribe are each, respectively, located in different geographic areas. The people of these tribes each practice their own religions; however, the defendant does not identify which of

the First Amendment was not implicated."); *Salerno*, 481 U.S. at 745 ("We have not recognized an overbreadth doctrine outside the limited context of the First Amendment.").

them, if any, he practices. Rather, he alleges to be a "sincere adherent to a bona fide Native American religion," and that he "exercises that religion through sacred dances." (Docket No. 30 at p. 3.) The defendant does not support that allegation with any documents or affidavits, nor does he identify to which specific Native American religion he adheres. Therefore, he has not met his initial burden under the RFRA to demonstrate that his possession of eagle feathers arises from a sincere religious belief, and not a cultural or philosophical expression. *See, e.g., Diaz v. Collins*, 114 F.3d 69, 72 (5th Cir. 1997) (defendant bears the burden of demonstrating a substantial burden to a sincere religious belief).

### 2. The Least Restrictive Means

Even if the defendant had met his initial burden, the court could not grant his motion to dismiss indictment because the United States has shown that the regulations implementing the BGEPA further a compelling government interest by the least restrictive means. Because neither party disputes that the regulations implementing the BGEPA further two compelling government interests, which are actually at odds—the preservation of bald and golden eagles, and the preservation of federally recognized Indian tribes—the only issue is whether or not the regulations further those goals by the least restrictive means. The court finds that they do.

As noted, the defendant does not dispute the government's compelling interest in supporting bald and golden eagle populations. Instead, the defendant argues that the government's restrictions are unduly burdensome, because it can meet its interest simply by enforcing laws banning eagle poaching. (Docket No. 30 at p. 32.) That is, by legalizing possession of eagle parts, but maintaining the federal repository as the sole legal means of access

12

to them, the defendant argues that the United States can protect bald and golden eagles without

burdening his religious use of feathers. The United States has shown, however, that it cannot

serve its interest in protecting eagles solely through anti-poaching laws, because it cannot

enforce anti-poaching laws without restricting possession of eagle parts. To illustrate, the

government has submitted numerous affidavits from the Department of Interior, including an

affidavit from Lucinda D. Schroeder, a Special Agent with the U.S. Fish and Wildlife Service,

which states:

> The fact that the Bald and Golden Eagle Protection Act and the Migratory Bird
> Treaty Act both contain possession prohibitions, and not just prohibitions against
> killing the birds, is significant for law enforcement efforts. This is because there
> is no reasonable forensic method by which law enforcement can determine if a
> bird was accidentally or intentionally killed, killed a hundred years ago, or killed
> yesterday. (Docket No. 38, Ex. 2 at ¶ 8.)

That is, the government cannot enforce its eagle protection laws without banning possession, at

least to some degree, because of the low probability of discovering poachers in the act. (*See*

Affidavit of Edgardo O. Espinoza, Docket No. 38, Ex. 3 at ¶ 4) ("There is no scientific test

currently available that could determine whether the part came from the Repository or any other

source."). The situation with regard to bald and golden eagle feathers is similar to other crimes,

such as child pornography, where it is difficult to prove the underlying illegal act once the item

is reduced to possession. 18 U.S.C. § 2252(a)(4)(B).

One reason why enforcement of the poaching ban presents such difficulties is the

existence of an extensive black market for bald and golden eagle parts, which is driven primarily

by the money prizes offered at pow-wow dancing competitions. (Affidavit of Douglas

Goessman, Docket No. 38, Ex. 7 at 4-5.) Due to the difficulty in stemming this black market,

13

the government has shown that it is virtually impossible for the Fish and Wildlife Service to protect bald and golden eagles without some ban on possession. (*Id*. at 9-10) ("[I]t is my belief, any additional exemptions to the BGEPA, such as having the USFWS . . . begin issuing eagle feathers to persons other than Native Americans . . . would eventually devastate state, federal and tribal conservation law enforcement efforts to protect bald and golden eagles.").  Prohibiting possession of contraband is often asserted as a valid means of eliminating the fruits of an illegal act.  *See, e.g. Employment Division, Dept. Of Human Resources of Oregon v. Smith*, 494 U.S. 872, 905 (1990); *Osborne v. Ohio*, 495 U.S. 103, 109-110 (1990).

In addition, the United States has demonstrated that poaching presents a significant challenge to bald and golden eagles, due to the low reproductive rates of those species. (Affidavit of Jody Gustisus Millar, Docket No. 38, Ex. 10.)  Bald eagles, for instance, do not mature until they are between four and six years old and, once they do begin producing young, do so at an average rate of only two per year. (*Id*. at ¶ 14.)  Due to the low reproductive rates, bald eagle populations rely on a high survival rate for adults, as opposed to a high production of young, to ward off extinction.  (*Id*. at ¶ 15.)  If poaching were to increase—due to an increased demand for black market bird parts, which could itself be caused by the loosening of the anti-possession laws—the eagle populations would likely suffer.  (*Id*. at ¶ 18) ("[O]n a long-term or widespread basis, unregulated take of mature bald eagles can depress, and potentially endanger the population.")

It was against this background of enforcement difficulties in the face of a black market in eagle parts—leading to a potential loss in eagle populations—that the Department of Interior sought to fashion a rule which preserves the traditional Native American use of feathers for

14

religious purposes. *See United States v. Dion*, 476 U.S. 734, 743-44 (1986) ("Congress . . . considered the special cultural and religious interests of Indians, balanced those needs against the conservation purposes of the statute, and provided a specific, narrow exception . . . ."). The United States and the defendant both agree that protecting the traditional religious customs of federally recognized Indian tribes is a compelling government interest. It was in furtherance of that interest that the Department created the eagle repository system, currently under which Native Americans face a waiting period of up to two years after submitting a request before receiving feathers, depending on the size and nature of the request. The defendant argues that, were he allowed to request eagle parts through the repository system, the wait would not be significantly lengthened, and therefore, that the BGEPA regulations are not narrowly tailored. However, the court finds that the defendant takes too narrow a view of the situation.

The Department of Interior cannot limit access to the eagle repository to "sincere adherents of Native American Religions" as the defendant suggests. Such a rule would violate the Establishment Clause. *See Rice v. Cayetano*, 538 U.S. 495, 514-17 (2000). If the eagle repository is to be opened up to all sincere adherents of Native American Religions, it must be opened up to all sincere adherents of all religions. *Id*. As the United States has shown, that could end up being a significant number of people, which would severely limit Native Americans' access to feathers through the repository system.[4] It would also, as highlighted

_____

[4]For instance, the members of the Wiccan and Santeria religions would likely require feathers. (Docket No. 38, Ex. 14 at ¶ 4; Ex. 15 at ¶ 6 "[I]t would be impossible to handle the number of eagle feather permits if virtually anyone could apply for this type of permit without increased staff and major funding."). In particular, the Santeria religion involves a sacrifice to Osain, an "extremely important deity" who requires a "ritual preparation [which] consists in preparing a gourd which ideally should contain up to 101 heads of different birds. Selected feathers of various birds contained in Osain's [gourd] are: owl, EAGLE, turkey, vulture, hawks,

15

above, create enforcement problems. Before arresting any person for illegal possession of eagle feathers, federal agents would be forced to determine, on a case-by-case basis, whether the eagle feathers were indeed a necessary part of that individual's religious practice. (Docket No. 38, Ex. 2 at ¶ 13.) That is an untenable situation. (*Id*.) ("[I]t is virtually impossible as a practical matter to challenge an individual's assertion that he holds a sincere religious belief that requires the use of eagle feathers or other parts.")

By predicating participation in the eagle repository on an ostensibly political categorization, and not a religious one, the Department of Interior deftly side-stepped the Establishment Clause and struck a careful balance between eagle preservation, and the preservation of Native American cultures. Were this category to be nullified, and the ban on eagle possession for non-official tribe-members lifted, it is possible that both government concerns would be thwarted—that is, both eagle populations and Native American cultures would suffer.

In *United States v. Antoine*, 318 F.3d 919, 922-23 (9th Cir. 2003), the Ninth Circuit Court of Appeals addressed whether or not the BGEPA violated the RFRA by barring non-members of federally recognized Indian tribes from accessing eagle feathers—the very issue we address today. In *Antoine*, the court recognized that, since the government had a compelling interest in protecting eagle populations to some degree, and because those populations are finite, "the burden on religion is inescapable; the only question is who to burden and how much." *Id*. at 923. In Antoine, as in this case, the defendant sought "to burden other people's religion more

_____

parrots, canaries, etc. Again, the feathers and/or the heads of the birds symbolize the powers of Osain as the Orisha of the woods and all the magical herbs and roots contained therein." (Docket No. 38, Ex. 18 at p. 5.)

16

and his religion less," but as the Ninth Circuit pointed out, "[t]his is not a viable RFRA claim; an alternative can't fairly be called 'less restrictive' if it places additional burdens on other believers." *Id.*, *see also United States v. Hugs*, 109 F.3d 1375, 1379 (9ᵗʰ Cir. 1997) (holding that the BGEPA permit scheme did not violate the RFRA); *U.S. v. Sandia*, 188 F.3d 1215, 1218 (holding that the defendant's prosecution for selling protected eagles under the BGEPA did not violate the RFRA); *but see United States v. Harmon*, 297 F.3d 1116, 11135 (10ᵗʰ Cir. 2002) (holding that the factual record did not, at the time, support a ruling on the RFRA issue).

The BGEPA regulations strike a delicate balance. Were the BGEPA to simply ban possession for all persons, the government would have succeeded in protecting eagle parts, but failed to protect Native American culture. Were the BGEPA to allow all persons to possess the eagle parts for any religious use, it would create severe difficulties in enforcing poaching laws, because it is (1) very rare to catch poachers in the act of poaching, and (2) nearly impossible to determine whether the birds were poached or not, when confiscated. Not only would the waiting period swell, making it difficult for the recognized tribes to use birds for their ceremonies, but the black market would also increase, since more people would be able to possess eagle feathers—legally or illegally procured—without fear of prosecution. In the long run, eagle populations would suffer. In the ensuing eagle scarcity, the government would have failed at both of its objectives.

In forming its categorization on a political basis, the government has balanced its two competing objectives in the only way this court has been shown to be possible. By limiting the number of people who can possess the feathers, the government succeeds in limiting the potential customers for the black market in eagle feathers. It also keeps the waiting period for

the eagle repository low. By granting access to the feathers only to members of the officially recognized tribes, the government protects those tribes in the only way possible under the Establishment Clause. The government has met its burden in showing that the regulations further a compelling government interest by the least restrictive means.

## II.     Defendant's Alternative Defenses Under the MBTA

Alternatively to his RFRA defenses, the defendant claims that he has not been properly charged under the MBTA because he did not actually "barter" or "possess" the contraband migratory bird feathers, as those terms are used in that statute. The court disagrees and finds that he was properly charged under the MBTA.

### A.     Bartering Migratory Bird Feathers

The defendant alleges that a feather-to-feather exchange cannot be considered "bartering" because that term requires a transfer of dissimilar objects—accordingly, feathers are too similar to each other to be bartered. (Docket No. 30 at p. 29-30.) The defendant cites Merriam-Webster's entry for "barter"—"to trade by exchanging one commodity for another," Merriam-Webster's Collegiate Dictionary 94 (10th Ed. 2002)—and on its basis declares that, because feathers are the same "commodity," they cannot be properly "bartered." That is nonsense. A person can barter one type of car for another type, a bologna sandwich for a turkey sandwich, and as equally, one type of illegal feather for another type of illegal feather. To illustrate, horse trading, which is by definition the trade of one type of animal for the same type, is a long-standing form of barter, under which one commodity—a horse—is traded for another commodity—a horse. People have found it worthwhile to trade horses, cars, and sandwiches, because of the individual differences within each type of commodity. Likewise, the defendant

presumably found it worthwhile to barter feathers because of the inherent differences between the various types of feathers in the market. Significantly, Merriam-Webster does not define "barter" as trading "one commodity for a wholly different type of commodity," but rather "exchanging one commodity for another." The defendant traded several commodities—feathers—for other commodities—also feathers—and his action falls under his own proposed definition.[5] Because his alleged "bartering" falls under the clear language of the criminal statute, we need not address the purpose of that statute at this stage. *Costello v. United States,* 350 U.S. at 363.

### B. Possession of Migratory Bird Feathers

The defendant argues that he was improperly charged with "possessing" migratory bird feathers because that term only refers to possessing "in a way that either harmed migratory birds or exploited harm done to them." (Docket No. 30 at p. 31.) Assuming that the MBTA should be interpreted as applying only "to activities that are intended to harm birds or to exploit harm to birds, such as hunting and trapping, *and trafficking in birds and bird parts*," *Mahler v. United States Forrest Service*, 927 F. Supp. 1559, 1579 (S.D. Ind. 1996) (emphasis added), the defendant's alleged conduct falls within that interpretation.

The defendant is not charged with merely possessing the feathers but, as discussed above, with both possessing and trading, or "bartering," them for other feathers. The defendant did not come to possess all of his feathers accidently by "picking up road kill," (Docket No. 30 at p. 33),

---

[5]The United States, in its Response, offers a host of useful alternative definitions for the term "barter," but the court finds the defendant's own proposed definition sufficient to encompass the defendant's alleged activities.

but rather possessed them, purposefully, for use in pow-wow dances, in direct contravention of the law. As the United States points out, the defendant's transfer of the feathers may fall directly under the conduct proposed, in *Mahler*, as being harmful to bird populations. 927 F. Supp. at 1579. As to whether or not the government has proven the defendant's guilt under the MBTA, the motion to dismiss stage is not the proper place for such inquiry. *U.S. v. Jones*, 2006 WL 399234, at *1 ("[A] motion to dismiss should be denied if it requires a pretrial test of the government's evidence."). However, in as much as the defendant is charged with both possession and bartering the feathers, the court finds that he was properly charged under the MBTA.

## III.    Defendant's "Outrageous Conduct" Challenge

Finally, the court turns to address the defendant's contention that his prosecution should be dismissed due to outrageous government conduct. The defendant alleges that the conduct of the undercover agent in this case was so outrageous as to violate the Fifth Amendment's guarantee of fundamental fairness. Fundamental fairness relates to the Due Process clause of the Fifth Amendment. *Hampton v. United States*, 425 U.S. 484, 495 (1976); *United States v. Brown*, 635 F.2d 1207, 1212 (6th Cir. 1980). In *Hampton*, a plurality of the United States Supreme Court speculated that some police conduct might be so egregious as to violate the accused's due process rights without implicating any specific doctrine, but noted that "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Hampton*, 425 U.S. at 495, n.7.

Since *Hampton*, the Sixth Circuit Court of Appeals has debated whether an "outrageous conduct" defense even exists. In *U.S. v. Barger*, 931 F.2d 359, 363 (6th Cir. 1991), the Sixth

20

Circuit articulated four factors for use in determining outrageous government conduct: "(1) the need for the police conduct as shown by the type of criminal activity involved, (2) the impetus for the scheme or whether the criminal enterprise preexisted the police involvement, (3) the control the government exerted over the criminal enterprise, and (4) the impact of the police activity on the commission of the crime." *See also United States v. Robinson*, 763 F.2d 778 (6th Cir. 1985). In applying those factors, the *Barger* court did not find "outrageous conduct" where government agents hired a Hell's Angel to travel from city to city, spending $150,000 of government money in order to incite other Hell's Angels to retaliate against another motorcycle gang with violence. *Barger*, 931 F.2d at 363; *see also United States v. Norton*, 700 F.2d 1072, 1075 (6th Cir. 1983) (finding no outrageous conduct occurred where a federal agent joined the Ku Klux Klan and actively participated in the planning and execution of a bombing operation).

In *United States v. Tucker*, 28 F.3d 1420, 1426 (6th Cir. 1994), the court observed that, "in more than two dozen cases . . . this circuit has rejected 'on the facts' every attempt to invoke the so-called 'due process' defense." Noting that the doctrine had never actually been applied by either the Supreme Court or the Sixth Circuit, the *Tucker* court held that it was "not required to recognize the 'due process' defense." *Id*. at 1427. In addition, the court listed "three strong reasons for concluding that such a defense simply does not exist." *Id*. Of particular interest, the court reasoned that inducement, "outrageous" or not, does not fall under the purview of the Fifth Amendment, but rather the statutory entrapment defense. *Id*. The court reasoned that because the legislative branch had already fashioned an "inducement" defense predicated on the defendant's intention, it would violate the separation of powers for the judicial branch to substitute its own doctrine predicated on the "outrageousness" of the government's actions. *Id*.

21

at 1428.  Therefore, the court held that the defendant would be limited to the defense of entrapment as defined by congressional statute.  *Id.*, *see also Barbee v. Wal-Mart Stores, Inc.*, No. 01-2228 GBRE, 2002 WL 1784318 at *2 (W.D. Tenn. Jul. 16, 2002) ("[A]llegations of entrapment alone do not support a due process claim.").

It is far from certain under Sixth Circuit precedent whether or not an "outrageous conduct" defense exists in this jurisdiction.  Even were it to exist, under *Barger* and *Norton*, we could not apply that doctrine in this case.  The agent in this case did not incite Winddancer to violence, nor did he participate in any bombing campaigns.  Rather, here is the story as presented.  A Fish and Wildlife Service agent, Buddy Shapp, contacted Winddancer, claiming to be a member of a federally recognized Indian tribe.  (Docket No. 30 at p. 4.)  Buddy Shapp claimed to be in need of feathers to perform a tribute dance for his dead father.   Winddancer agreed to perform a trade.  The two performed trades on two successive days.  During the second trade, Shapp told Winddancer he thought some of his own feathers had been poached, but the information did not deter Winddancer from performing the trade.  After Shapp left on the second day, agents arrived at Winddancer's trailer and performed a search.

In short, an undercover agent proposed to Winddancer that they barter feathers, presenting himself as a sympathetic feather afficionado, and Winddancer agreed to do so.  In light of the difficulties outlined above in enforcing the MBTA and the BGEPA, and in light of the severity of the conduct that the Sixth Circuit has determined was not "outrageous" in prior cases, the conduct alleged by Winddancer in this case cannot give rise to an "outrageous conduct" defense.

**CONCLUSION**

22

For the reasons stated herein, defendant Winddancer's Motion to Dismiss Indictment will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge